UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.

Case No.   5:06-cr-6-Oc-10GRJ

JAVIER DOMINGUEZ-RAMIREZ

### REPORT AND RECOMMENDATION[1]

Pending before the Court is Defendant's Amended Motion To Suppress Evidence.[2] (Doc. 49.) The United States has filed a Response. (Doc. 47.) An evidentiary hearing was held before the undersigned on May 2, 2006 and, accordingly, the matter is ripe for review. For the reasons discussed below Defendant's Amended Motion To Suppress Evidence is due to be **DENIED**

### I. Introduction

The Defendant and an associate, Prudencio Rabadan-Ramirez, are charged in this case in a four count indictment with conspiracy to possess with intent to distribute 100 kilograms or more of marihuana, aiding and abetting with each other to possess with intent to distribute 100 kilograms or more of marihuana, and aiding and abetting

---

[1] Specific, written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

[2] Defendant also filed a Motion To Suppress Evidence. (Doc. 42.) The only change in the amended motion concerns several changes in paragraph one, none of which impacted the Court's determination of the motion.

with another to possess with intent to distribute a detectable amount of marihuana.

The investigation in this case began on or about January 5, 2006, when agents from Immigration and Customs Enforcement ("ICE") intercepted eight pallets of bedroom furniture at the point of entry in El Paso, Texas, that contained packages of marihuana concealed within the furniture.[3] The pallets - which contained more than 500 kilograms of marihuana concealed inside - were destined for an address in Ocala, Florida located at 10560 West Highway 40 ("Highway 40 Residence"). Law enforcement officers decided to make a controlled delivery of the pallets. The pallets were flown to the Naval Air Station in Jacksonville, Florida and then transported to the Customs and Border Protection facility located at the Orlando International Airport for delivery to United Parcel Service Airfreight for pick-up. On January 14, 2006 the pallets were picked-up by co-defendant, Prudencio Rabadan-Ramirez in a rented U-Haul and were transported by him to the Highway 40 Residence in Ocala, where he was later met by the Defendant and the Defendant's brother, Jose Dominguez-Ramirez.

The Defendant, Co-Defendant Prudencio Rabadan-Ramirez and the Defendant's brother, Jose Dominguez-Ramirez, were arrested on January 14, 2006 at the Highway 40 Residence by a team of law enforcement officers from Immigration and Customs Enforcement ("ICE"), the Drug Enforcement Administration ("DEA"), the Orange County Sheriff's Office and the Marion County Sheriff's Office. The marihuana concealed in the furniture is not challenged by the Defendant in the instant motion to suppress. Rather, the focus of the instant motion to suppress concerns ten bricks of marihuana, wrapping

---

[3] Doc. 1, ¶4.

material, currency, vacuum bags and other drug paraphernalia discovered by law enforcement officers during a subsequent search of Defendant's residence located at 3720 S.W. 95th Avenue, Ocala, Florida - a rental unit physically located on the property of a local horse farm named "Live Oak Farm" ("Live Oak Residence"), where the Defendant was employed.

Defendant contends that the search of the Live Oak Residence violated his rights under the Fourth Amendment to be free from unreasonable searches and seizures because the residence was searched without a warrant and the consent to search given by the Defendant's wife to law enforcement was not consensual. Alternatively, relying upon *Georgia v Randolph*,[4] Defendant contends that even if his wife consented to the search, the search was invalid because consent was required from both the Defendant and his wife.

## II. Evidence And Testimony

The United States called Felix Rodriguez, a drug agent for the Marion County Sheriff's Office, and Gary Sams, a Special Agent with the Drug Enforcement Administration, as witnesses. The Defendant called his wife, Patricia Dominguez, as his only witness.

Agent Rodriguez has been employed by the Marion County Sheriff's Office for fourteen years, four of which have been in the drug unit. Agent Rodriguez first became involved in the investigation in this case in January 2006 when he received a telephone call from ICE agents in Jacksonville advising that they had intercepted a shipment of

---

[4] _ U.S. _, 126 S.Ct. 1515 (2006).

furniture destined for Ocala, which had marihuana concealed inside the furniture. During the evening of January 14, 2006, after the arrest of the Defendant, Agent Rodriguez was present during a portion of the interview of the Defendant. The Defendant was interviewed by ICE Agent Chris Note and DEA Special Agent Florentino Rosales, who was speaking to the Defendant in Spanish. Agent Rodriguez is fluent in Spanish and was able to understand the questions being asked to the Defendant and the Defendant's responses.

During the interview, Agent Rosales asked the Defendant if law enforcement could search his residence, located at the Live Oak Farm. According to Agent Rodriguez, the Defendant responded that agents could search his house in the morning because the Defendant's wife was "hooked-up" to an insulin pump and the Defendant did not want her disturbed until morning. This portion of the interview took place between 1:00 and 2:30 a.m.

Agent Rodriguez and Special Agent Sams also interviewed Defendant's brother, Jose Dominguez-Ramirez.  The interview took place in Spanish with Agent Rodriguez providing all of the translation for Special Agent Sams. The Defendant's brother advised Agents Rodriguez and Sams that he rented a room from the Defendant at the Defendant's residence located at Live Oak Farm. Agents Rodriguez and Sams asked the Defendant's brother for permission to search his room at his brother's residence and the Defendant's brother consented to the search of his room. The Defendant's brother was then transported to the Live Oak Residence by Agent Rodriguez and agents from the DEA. When they arrived at the Live Oak Residence Agent Rodriguez, who was wearing a jacket prominently displaying "Marion County Sheriff's Office" and his badge,

approached the front door and asked the Defendant's brother if he had a key. Defendant's brother advised Agent Rodriguez that he did not have a key with him and as a result Agent Rodriguez was forced to knock on the front door. The Defendant's wife, Patricia Dominguez, answered the door. Agent Rodriguez explained to Mrs. Dominguez that her husband had been detained by law enforcement during an investigation in which marihuana had been confiscated. Agent Rodriguez advised Mrs. Dominguez that the Defendant's brother had consented to a search of his room at the house. Agent Rodriguez asked Mrs. Dominguez if agents could come into the residence and Mrs. Dominguez consented.

     While in the living room of the residence Agent Rodriguez explained to Mrs. Dominguez the details of the investigation and that her husband had been arrested. Agent Rodriguez told Mrs. Dominguez that her brother-in-law had consented to a search of his room but that it was up to her if she wanted the agents to search the house. Two of the agents went into the room rented by Jose Dominguez-Ramirez and conducted a search and Agents Rodriguez and Sams remained in the living room with Mrs. Dominguez. None of the agents were wearing "SWAT" gear and they were dressed in jeans and a jacket identifying them as law enforcement. At no time were any guns drawn or removed from holsters by any of the agents. While agents were conducting a search of the room rented by Jose Dominguez-Ramirez, Agents Rodriguez and Sams advised Mrs. Dominguez that her husband had consented to a search of the house but that he wanted agents to come back in the morning to conduct the search so that she would not be disturbed. Agent Rodriguez explained that agents came to the house anyway because the brother in law had consented to the search of

his room. Because Mrs. Dominguez already was awake Agent Rodriguez asked her if it was "okay" to search the residence. In response Mrs. Dominguez asked Agent Rodriguez what he was looking for and was told that agents were looking for marihuana or large amounts of money. Mrs. Dominguez told Agent Rodriguez that there was nothing like that in the house. When Agent Rodriguez explained to Mrs. Dominguez about the consent to search Mrs. Dominguez asked Agent Rodriguez if he needed a search warrant and was told that he did not need one if she consented. According to Agent Rodriguez, Mrs. Dominguez never asked him what would happen if she did not give her consent. Mrs. Dominguez was told by Agent Rodriguez that if agents found any contraband it would be taken from the house. Mrs Dominguez asked Agent Rodriguez whether she was going to be arrested if agents recovered anything and was told by Agent Rodriguez that she was not a target of the investigation. Agent Rodriguez also told Mrs. Dominguez that if she wanted the agents would come back in the morning to search the house as her husband had wanted or they could search the house then. According to Agent Rodriguez, Mrs. Dominguez told him that it was fine to search the house then.

     Agent Rodriquez then went to his vehicle to obtain a consent to search form to be signed by Mrs. Dominguez. When Agent Rodriguez reentered the residence Agent Sams - who had begun the search after Mrs. Dominguez had consented - told Agent Rodriguez that Agent Sams had located a bag in a sock drawer in the bedroom which contained currency. Shortly thereafter one of the other agents located ten pounds of marihuana that had been hidden inside of a dryer in the laundry room. Mrs. Dominguez denied having any knowledge of the marihuana in the dryer and told Agent Rodriguez

6

that she had not looked inside the dryer since the previous Sunday when she did the laundry. Agents also located in the room rented by Jose Dominguez-Ramirez, wrapping material and other drug paraphernalia.  Agent Rodriguez then filled out the "Permission To Search Residence" form, gave it to Mrs. Dominguez for her review and signature. Mrs. Dominguez signed the Permission To Search Residence form[5] and it was then witnessed by Agent Sams.

      The consent to search form contains the notation "10-97 3:15," which denotes the arrival time at the Live Oak Residence. At the bottom of the consent to search form it contains the notation "0344," which refers to 3:44 a.m., the time Mrs. Dominguez signed the consent to search form. Shortly after Mrs. Dominguez executed the consent to search form the agents left the residence.

      Special Agent Sams provided essentially the same testimony as Agent Rodriguez with only slight differences. Agent Sams has been in law enforcement for 33 years, twenty of which have been as a Special Agent with the DEA. Agent Sams confirmed that Defendant's brother consented to the search of the room he rented from his brother at the Live Oak Residence. According to Agent Sams, when he, Agent Rodriguez, another DEA agent and Defendant's brother arrived at the Live Oak Residence Agent Rodriguez knocked on the door, which was answered by Patricia Dominguez. Agent Sams asked if the agents could come into her house because they wanted to talk to her about an incident involving her husband. Mrs. Dominquez allowed the agents inside of the residence. Agent Sams and the other agents entered the

---

[5] Government Ex. "1".

residence and sat down in the living room on a couch and explained to Mrs. Dominguez that her husband had been arrested for trafficking in marihuana and that agents believed there might be additional contraband in the house. Agents told Mrs. Domnguez that her husband had consented to the search of the residence. Mrs. Dominguez asked whether the agents needed to get a search warrant and was told that they did not need to get one if she granted consent. Agent Sams also told her that her husband had consented to a search but her husband wanted agents to wait until the morning to conduct the search but that the agents wanted to take care of the search while they were there. According to Agent Sams, Mrs. Dominguez told the agents they could search the house.

  Based on this consent, Agent Sams went to the bedroom first while Agent Rodriguez went outside to his truck to obtain a consent to search form. While searching a sock drawer in a dresser in the bedroom Agent Sams located a bag with money in it. Agent Sams testified that agents never yelled at Mrs. Dominguez nor did they tell her that if she did not consent agents would obtain a search warrant and search the house. During the search Mrs. Dominguez asked if she was going to be charged if agents found any contraband. Mrs. Dominguez was told by agents that she was not a suspect or target of the investigation at that point and would not be arrested that evening. Agent Sams testified that agents never told Mrs. Dominguez that if she signed the consent to search form she would not be arrested or charged.

  The Defendant called his wife, Patricia Dominguez, to testify about the events that transpired at the Live Oak Residence that evening. Mrs. Dominguez, is a 46 year old high school graduate presently employed as a fork lift operator for Closet Maid in

Ocala. She is fluent in English and testified without the need for an interpreter. Her husband - the Defendant - worked at Live Oak Farm as a foreman and assistant trainer. Because of his job duties, which involved caring for the horses on the farm, it was not unusual for him to be out all night.

According to Mrs. Dominguez, agents rang the doorbell of the Live Oak Residence at about 3:15 a.m on January 14, 2006 and woke her up. Mrs. Dominguez and her husband have lived in the Live Oak Residence for about eight years. When Mrs. Dominguez opened the door there were four agents standing there with her brother-in-law. Her brother-in-law, Jose Dominguez-Ramirez, had been renting a room in the house from them for about one and a half months. However, even though her brother was a tenant he did not have a key the residence. Mrs. Dominguez testified that Agent Rodriguez told her that her husband had been arrested for drug trafficking and that her brother-in-law had given his consent to search his room. Mrs. Dominguez testified that she asked the agents if they had a search warrant. She said she knew to ask for a warrant because she watches "a lot of Law And Order" and she knows "a little bit [about] the law." Agents told her that they did not need a search warrant to search her brother-in-law's room because he had given permission. Mrs. Dominguez told agents it was "okay." All four of the agents entered the residence with her brother-in-law. Two of the agents went into the room rented by her brother-in-law and Agents Rodriguez and Sams went with Mrs. Dominguez and sat on the couch in the residence. According to Mrs. Dominguez, the agents were in her brother-in-law's room for about ten minutes but did not find anything. Before she had discussed with agents her consent to search the residence, she testified that she saw one of the agents in the computer

room across the hallway from where she was sitting.[6]

Mrs. Dominguez also testified that Agent Rodriquez went into the laundry room "probably when the other officers were in the computer room." Even though agents were in rooms of the house - other than her brother-in law's room - Mrs. Dominguez never instructed them to leave or not to enter any rooms of the residence other than the rented room. According to Mrs. Dominguez, Agents found money in her sock drawer without her permission before agents located the marihuana in the dryer. When agents found the money in the sock drawer in the dresser agents asked Mrs. Dominguez if she knew where the money had come from. She told them that she did not know and that she does not go into the sock drawer very often.

According to Mrs. Dominguez' version of the events, after agents found the marihuana in the dryer they filled out the consent to search form and told her that if she signed the form she would not be arrested for what they had found in the residence. Mrs. Dominguez testified that agents left the residence about ten minutes after she signed the consent to search form. Thus, according to Mrs. Dominguez, she never gave permission to search any part of the house other than her brother-in-law's room and agents never asked her for permission to search the residence. While Mrs. Dominguez never denied reading the consent to search form she testified that she read as much as she could understand on the form.

---

[6] This testimony is consistent with the testimony of Agent Rodriguez, who testified on rebuttal that when the agents entered the residence two of the agents made a "protective sweep" to insure that there were not any other individuals in the residence. Notably, Mrs. Dominguez did not testify that the agents began a search of the computer room at that time. After the protective search the agents initiated the search of the room rented by Jose Dominguez-Ramirez.

### III. ANALYSIS OF ISSUES

A.  **Patricia Dominguez' Consent To Search The Residence**

One of the exceptions to the Fourth Amendment requirement that law enforcement obtain a search warrant before searching a private residence is where the resident voluntarily consents to the search.[7] For the consent to be sufficient to overcome Fourth Amendment scrutiny the consent must have been given freely and voluntarily and not merely as an acquiescence to law enforcement authority.[8] The determination of voluntariness must be conducted by an examination of the totality of the circumstances, taking into account factors such as: the person's youth, the person's education, the existence of advice as to the nature of the constitutional right involved, the length of the detention preceding the request to consent, the nature of the prior questioning, and whether any physical threats were made.[9]

As highlighted in the testimony discussed above, there is a sharp conflict between the testimony of Mrs. Dominguez and the testimony of Agents Rodriguez and Sams concerning whether Mrs. Dominguez gave consent to the agents to search the Live Oak Residence. The Court will first examine the testimony of the witnesses that was consistent to determine whether these events evidence that the consent given by Mrs. Dominguez was voluntary. Secondly, the Court will then resolve the conflicting testimony to determine whether the credible evidence establishes that the consent was

---

[7] Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

[8] Bumper v. North Carolina, 391 U.S. 543, 548 (1968).

[9] Schneckloth v. Bustamante, 412 U.S. 218, 226 (1973).

voluntary.

Turning first to the testimony that was not materially in conflict, there was no serious dispute between the testimony of the agents and the testimony of Mrs. Dominguez that four agents and Defendant's brother-in-law went to the Live Oak Residence and arrived at about 3:15 a.m. on January 14, 2006. The Government established - and the Defendant did not challenge - the fact that Defendant's brother-in-law, Jose Dominguez-Ramirez, rented a room at the Live Oak Residence and that he gave his verbal consent to law enforcement to search his room. The testimony also was not in dispute that law enforcement never pointed a gun, never drew a weapon while at the residence, never yelled or threatened Mrs. Dominguez and that the agents were only wearing jeans and jackets identifying themselves as law enforcement officers.

Mrs. Dominguez agreed that when the agents arrived at the residence agents informed her that her husband had been arrested or detained for trafficking in marihuana. Additionally, although there were slight variations in the testimony, Mrs. Dominguez and the agents all testified that Mrs. Dominguez asked agents if they needed a search warrant and she was told that agents did not need one if Mrs. Dominguez consented to the search. Mrs. Dominguez read - but said she did not understand - and signed the "Permission To Search Residence" form, which was presented to her after the search had been conducted and the agents had located the currency in the sock drawer and had found the ten pounds of marihuana in the dryer in the laundry room.

The Permission To Search Residence form provides in relevant part that Mrs. Dominguez authorize[s] agents "to search my residence ... any and all rooms, closets,

12

out buildings of any type, any and all containers and personal property located therein ..." Notably, the form recites that: "This written permission to search without a warrant is given by me to the above officer(s) freely and voluntarily, without any threats or promises having been made." While this form was signed after the search had been completed - and therefore is not totally dispositive of whether consent was given - the form is, nonetheless, written in simple easy to understand language.

      The evidence not in conflict establishes that law enforcement entered the residence with lawful authority. Mrs. Dominguez opened the door of the residence and allowed the agents to enter without objection. Indeed, the agents had authority from Jose Dominguez-Ramirez to search the room he rented at the residence. As such, any items discovered in his room were obtained as part of a lawful consent search. Moreover, there was no testimony that law enforcement utilized any coercive police tactics or that the Defendant did not understand that she had a right to insist that law enforcement obtain a search warrant. Mrs. Dominguez readily admitted that she asked the agents whether they needed a warrant to search the premises and that she knew to ask this question because she watched police shows on television and knew a little bit about the law. As such, there was no question that Mrs. Dominguez knew and understood that if she did not consent to the search the agents could not search the residence without a warrant. All of these circumstances point toward a finding that the consent to search allegedly given by Mrs. Dominguez was given freely and voluntarily.

      The analysis of whether the consent was voluntary does not end here because the Court must resolve a sharp conflict in the testimony with regard to whether consent was given by Mrs. Dominguez. Mrs. Dominguez testified that the agents never

requested permission to search the residence and therefore she never gave her oral consent before the Permission To Search Residence form was signed. Both Agents Rodriguez and Sams testified that they told Mrs. Dominguez they needed her permission and that Mrs. Dominguez told them it was fine to do so.

Having observed the testimony of the witnesses and their demeanor the Court finds that on this issue Mrs. Dominguez' testimony was not entirely credible for several reasons. First, Mrs. Dominguez admitted that she asked agents whether they needed a warrant to search the residence and was told that they did not if she consented. It is not plausible that this discussion took place and then agents proceeded to search the entire residence without ever having asked her for permission and without Mrs. Dominguez ever voicing an objection before or during the search.

Secondly, Mrs. Dominguez' testimony is inconsistent with the factual representations in Defendant's Motion to Suppress. In Defendant's Motion To Suppress, Defendant asserts that "While inside the residence, after having been there for at least one half hour, the agents requested permission to search the entire residence, and told [Mrs. Dominguez] that if she did not consent, they would 'get a search warrant and search it anyway." Mrs. Dominguez never testified that agents threatened that if she did not consent they would get a warrant and search the residence anyway. Even more telling is the fact that Mrs. Dominguez never testified that she had any discussion with the agents about searching the entire residence. Thus, her testimony at the evidentiary hearing - that she never discussed consent with the agents - is wholly inconsistent with the Defendant's own motion which affirmatively represents that agents made a request to search the residence albeit with the threat that agents would get a warrant if Mrs.

Dominguez did not consent. Notably, neither the agents nor Mrs. Dominguez testified that agents threatened to get a warrant if she did not consent.

Accordingly, the Court finds that the testimony of Mrs. Dominguez regarding this issue is not credible and that the consistent and detailed testimony of two experienced law enforcement officers, each of whom testified that they asked for and obtained consent to search the residence, is more credible. Indeed, to accept Mrs. Dominguez' testimony at face value would paint a scenario in which two experienced law enforcement officers searched the entire residence without the consent of the homeowner and after having explained that consent was necessary for them to conduct a search.

Lastly, the execution of the Permission To Search Form, while not dispositive of consent - because it was executed after the search - is, nonetheless, probative of the issue of consent because the form clearly represents that the consent was given freely and voluntarily without threats or promises. However, there was conflicting evidence concerning what was said or not said when Mrs. Dominguez signed the consent. Mrs. Dominguez testified that the agents told her if she signed the consent form they would not arrest her for the contraband discovered in the residence. The agents, of course, flatly deny that any such discussion took place. Instead the agents testified that before they searched the residence Mrs. Dominguez asked whether she would be arrested if they found anything and agents told her that she was not a target of the investigation and that she would not be arrested at that time. Indeed, Mrs. Dominguez was not arrested and has never been charged in this matter.

The Court again finds Mrs. Dominguez' testimony regarding this issue not to be

credible for several reasons. First, the representation on the Permission to Search Residence form - that no threats or promises had been made - appears directly above Mrs. Dominguez' signature in plain English. Mrs. Dominguez never denied reading the form but attempted to qualify her reading of the form by stating that she read what she could understand. No reason nor explanation was offered by Mrs. Dominguez suggesting that she could not understand those words.

Lastly - and again most telling of Mrs. Dominguez' lack of credibility regarding this testimony - there is absolutely no mention in Defendant's motion of any discussion, promise or threat made by agents to Mrs. Dominguez that she would not be arrested if she signed the consent to search form. The fact that there is no mention of this discussion in Defendant's Motion To Suppress is highly suggestive that the discussion never took place and Mrs. Dominguez came up with this "story" while on the witness stand to attempt to discount the effect of the consent form.[10]

Accordingly, for these reasons, the Court concludes that the agents requested and obtained the voluntary consent of Mrs. Dominguez before searching the residence and, therefore, the search of the Live Oak Residence did not violate the Fourth Amendment.

B. *Georgia v. Randolph* **Does Not Require Suppression**

Relying upon *Georgia v. Randolph*, Defendant argues that "no valid consent could be obtained from Patricia Dominguez when the agents were already aware of

---

[10] While the Court recognizes that Defendant's Motion To Suppress was prepared by Defendant's counsel, and not by Mrs. Dominguez, it is highly unlikely that Defendant inadvertently would omit an important discussion in the recitation of the facts in support of his motion, particularly in view of the fact that Defendant actually amended his motion to change facts in paragraph one of his Motion To Suppress.

Defendant Dominguez-Ramirez' refusal to consent to a search of his residence." Defendant's argument is misplaced for two reasons.

First, it is incorrect to characterize the "consent" Defendant provided to the agents as "a refusal to consent to a search of his residence." The testimony was not controverted that the Defendant told agents they could search his residence but not until the morning. While the qualification "not to search until the morning" may have placed a time frame on the consent by the Defendant it was not a refusal to provide consent as Defendant suggests but rather a consent with qualification. Thus, in this case there was never a refusal to search by the co-owner husband sufficient to raise the issue of whether both tenants must consent before a search is conducted of jointly owned property.

Secondly, even assuming *arguendo* that the Defendant's consent with qualification was viewed as a refusal to consent, *Randolph* is still inapplicable because the Defendant, here, was not physically located at the premises when the refusal was made to law enforcement.

In *Randolph* the Supreme Court reviewed the propriety of a search of a marital home where the wife had called the police to investigate a domestic violence situation with her husband. When the police arrived, the husband - who was physically present at the residence - refused to give the police consent to search the residence even though the wife had granted permission to search the residence. Law enforcement officers entered the residence, recovered drug paraphernalia and then used that evidence to obtain a search warrant after which they found additional contraband. The Supreme Court held that the warrantless search of the residence over the objection of the

17

physically present husband was unreasonable and therefore violated the Fourth Amendment. *Randolph* therefore stands for the "straightforward application of the rule that a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of fellow occupant."[11] The *Randolph* Court, however, left intact the rule that the consent of only one co-tenant is sufficient so long as the objector is not present and the police have not removed the objecting tenant from the entrance for the sake of avoiding a possible objection.[12]

Here, law enforcement obtained the consent of the physically present wife, Patricia Dominguez and did not - as was the case in *Randolph* - search the premises over the objection of the physically present co-tenant. The Defendant was in custody at a location more than 15 minutes away from the residence and there was no evidence presented that the Defendant had been removed from the premises by law enforcement in order to avoid the Defendant from voicing his objection at the residence. Earlier that evening the Defendant was arrested several miles away at the Highway 40 Residence and then taken to the Sheriff's Office for questioning. The Defendant was never present at the Live Oak Residence that evening after he left to meet his associate who had retrieved the furniture filled with kilogram packages of marihuana. Accordingly, *Randolph* simply does not support the Defendant's argument that the evidence located at the Live Oak Residence should be suppressed because the Defendant "refused" to

---

[11] Randolph 126 S.Ct. at 1528.

[12] Thus, the Randolph Court expressly distinguished and left undisturbed its prior precedent in United States v. Matlock, 415 U.S. 164 (1974), which held that the "co-tenant's consent as good against 'the absent, nonconsenting resident." 415 U.S. at 170.

consent to the search until morning.

## IV. **RECOMMENDATION**

In view of the foregoing, it is respectfully **RECOMMENDED** that Defendant's Motion to Suppress Evidence (42) and Amended Motion To Suppress Evidence (Doc. 49) should be **DENIED.**

**IN CHAMBERS** at Ocala, Florida this 15th day of May, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:

    Honorable Wm. Terrell Hodges
    Senior United States District Judge

    United States Attorney (Citro)
    Counsel for Defendant